IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                    No. 16-CR-1732 MCA

GABRIEL BENAVIDEZ,

    Defendant.

## MEMORANDUM OPINION AND ORDER

    THIS MATTER is before the Court on *Defendant's Motion to Suppress Evidence Derived from Illegal Search*. [Doc. 32] The Court, having considered the submissions, the relative law, and otherwise being fully informed, hereby **GRANTS** the *Motion.*

**BACKGROUND**

    Defendant is charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§922(g)(1) and 924(a)(2). [Doc. 4] The parties largely agree about the facts leading up to Defendant's arrest. On March 8, 2016, a woman identified as J.L. called the Albuquerque Police Department from an apartment in Albuquerque, New Mexico and reported that Defendant had a knife and was threatening her. [Doc. 32, p. 1; Doc. 33, p. 1] Police officers responded to the apartment and knocked repeatedly but no one came to the door. [Doc. 32, pp. 1-2; Doc. 33, p. 2] Officers heard sounds as though someone pushed items against the front door. [Doc. 32, pp. 1-2, Doc. 32-2, p. 3; Doc. 33, p. 2] Eventually J.L. responded but refused to leave the apartment, told officers that she

1

would not open the door because one of her sons was asleep in the bedroom, and told officers that Defendant had left.   [Doc. 33, p. 2]   Officers saw Defendant look through the blinds of the sliding door.   [Doc. 33, p. 2]   Eventually, officers conversed with J.L. at the front door and later with Defendant at the back door, both of whom refused to leave the apartment.   [Doc. 32 pp. 1-2; Doc. 33, p. 2]

Finally, after 90 minutes, Defendant came out of the apartment and was arrested. [Doc. 32, p. 2; Doc. 33, p. 2]   According to the "Affidavit for Search Warrant," after "the occupants of the apartment . . . exited safely and [Defendant] was detained," officers "conducted a safety sweep of the apartment to insure no other person(s) were hiding or concealing themselves where one could."   [Doc. 32-2, pp. 3-4]   According to the briefs of both parties, at the time of the "safety sweep," J.L. and her children were in the room officers first entered.   [Doc. 32, p. 2; Doc. 33, p. 2].   Either way, according to Defendant, officers conducted this "safety sweep" after "assur[ing] themselves of J.L.'s safety and the safety of her children." [Doc. 32, p. 2]

After police officers conducted the protective sweep, they spoke to J.L.   [Doc. 32, p. 2; Doc. 33, pp. 2-3]   J.L. told them that Defendant lived alone in the apartment, that she was either "just visiting" [Doc. 32, p. 2] or had returned to retrieve clothing [Doc. 33, p. 3], and that she was not aware of any drugs or firearms in the apartment.   [Doc. 32, p. 2] Defendant argues that, "[h]ad this strategically delayed interview been conducted when officers first entered the apartment, they would have known that no further search was necessary."   [Doc. 32, p. 2]

2

The only significant factual dispute between Defendant and the Government is whether, during the "safety sweep," a firearm was in plain view. According to Defendant, during the "safety sweep," an officer looked inside a closet and under "full bags of clothes in white trash bags that appear to stand as much as (2) feet high, in a full bedroom closet," where they saw a firearm. [Doc. 32, p. 3] Defendant contends that it was obvious that no person could have been hiding under these bags. [Doc. 32, p. 4] The Government claims that "once officers opened the closet door, the rifle was in plain view on the closet floor." [Doc. 33, pp. 9-10]

Task Force Officer Hernandez submitted a search warrant affidavit that Defendant argues "demonstrat[es] a lack of good faith in applying for the warrant." [Doc. 32, p. 13] The "Affidavit for Search Warrant" states:

> During the sweep, Officer Henry saw on the floor of the master bedroom closet, a long barreled rifle that he described to have a black in color handle and a wood type stock. . . . I spoke with the victim in this incident, [J.L.] During our conversation she did tell me that she was in fear of receiving an immediate assault and/or battery from the suspect. . . . [J.L.] stated that she had previously been the victim of domestic violence committed against her by . . . Benavidez and that there is a recent criminal case pending with the 2nd Judicial District Court, of New Mexico. [J.L.] stated that Benavidez had arrived at the apartment "high" and stated that Benavidez uses "methamphetamine."

[Doc. 32-2, p. 4] Defendant argues Officer Hernandez left out of the affidavit that J.L. made inconsistent statements and that there was no evidence to support that J.L. could recognize the signs of methamphetamine intoxication. Thus, Defendant argues that Officer Hernandez "withheld material information about the reliability of the only

3

legally-obtained evidence presented - the statements of J.L." [Doc. 32, p. 13]

**ANALYSIS**

 *A Hearing is Not Necessary*

When there are no material facts in dispute, a hearing on a motion to suppress is not necessary. "[A]n evidentiary hearing is only required when the motion to suppress raises factual allegations that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue." *United States v. Glass*, 128 F.3d 1398, 1408-09 (10th Cir. 1997) (internal quotation marks, citations and brackets omitted); *see also United States v. Pettigrew*, 468 F.3d 626, 638 (10th Cir. 2006) (rejecting defendant's argument that an evidentiary hearing was necessary where the "Government conceded the facts as related by [the Defendant]"); *United States v. Jackson*, 363 Fed. Appx. 208, 210 n.2 (3rd Cir. 2010) (unpublished decision) (collecting cases which state that the party seeking a hearing on a motion to suppress bears the burden of establishing that there are material, disputed factual issues). The decision of whether or not an evidentiary hearing is necessary is within the discretion of the district court. *Glass*, 128 F.3d at 1408.

Neither party requested a hearing on the *Motion to Suppress*. There is one glaring disputed fact: whether the officer moved bags when searching the closet or whether the firearm was in plain view. However, if the warrantless search was not justified, that fact is immaterial. The facts relevant to deciding whether the warrantless search was justified only potentially vary in one way, which is not material: whether, after Defendant exited the

4

apartment and was in custody, J.L. and her children also exited [Doc. 32-2, p. 4], or whether the officers entered and found them safe immediately upon entering the first room, the living room [Doc. 32, p. 2; Doc. 33, p. 2].  Either way, before searching the bedroom, the officers had ascertained that J.L. and her children were safe.  For the reasons set forth later in this Opinion, this fact is dispositive to the *Motion to Suppress*.  Thus, no hearing is necessary.

### *Protective Sweep*

In the search warrant affidavit, Officer Hernandez states:  "members of the Albuquerque Police Department conducted a *safety sweep* of the apartment *to insure no other person(s) were hiding or concealing themselves where one could.*"  [Doc. 32-2, p. 4 (emphasis added)]  Thus, in arguing that the search was not justified, Defendant argued law relating to protective sweeps.  However, the Government relies on a completely different theory and different case law to justify the search:  the "exigent circumstances/emergency aid exception."  [Doc. 33, pp. 5-8]  Nonetheless, the Government does not explicitly abandon the protective sweep theory.  Accordingly, the Court addresses both exceptions to the requirement that the government obtain a warrant before searching a home.

In *Maryland v. Buie*, 494 U.S. 325, 334-35 (1990) our United States Supreme Court sanctioned and defined protective sweeps by holding as follows:

> We also hold that as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest

>from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. . . .
>
>We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

*Id.* (footnote omitted). Our Tenth Circuit holds that protective sweeps "are only permitted incident to an arrest." *United States v. Torres-Castro*, 470 F.3d 992, 996 (10th Cir. 2006). Moreover, there must be some articulable facts to support a belief that someone posing a danger is in the home. *See Fishbein v. City of Glenwood Springs, Colorado*, 469 F.3d 957, 962, 963 (10th Cir. 2006) (stating that a protective sweep is permissible where "police relied on various bits of circumstantial evidence to inform their judgment that a hostile third party might be present" but not permissible where "officers had *no* reason to believe there was any hostile person—or any person at all—inside the house" (emphasis in original)); *United State v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) (rejecting the argument that a belief that a murder suspect had an accomplice was sufficient to justify a protective sweep where there "was no indication that the officers were in danger from a hidden accomplice" at time of search and also concluding that a suspicion that "a child may have been inside in no way relates to officer safety, the goal of a protective sweep"); *United States v. Owens*, 782 F.2d 146, 151 (10th Cir. 1986) (concluding that there was no threat to

6

officers' safety where they had "retreated to a safe position" after arresting the defendant). Moreover, this case is indistinguishable from another Tenth Circuit case, *United States v. Carter*, 360 F.3d 1235, 1242-43 (10th Cir. 2004), which held that the protective sweep exception to requirement for a search warrant was not met where police arrested the suspect outside, rather than in the confined and unfamiliar interior of the house or garage, and where there was no reason to believe that anyone else remained inside the garage or backyard which were searched.   Thus, the Court agrees with Defendant that there were no articulable facts or reasonable inferences therefrom that anyone else was present in the home and presenting a threat to J.L. or the officers after Defendant was arrested.  [Doc. 32, pp. 8-9]   Accordingly, the warrantless search was not justified by the protective sweep exception to the search warrant.

### *Exigent Circumstances/Emergency Aid*

Even though the "Affidavit for Search Warrant" only expressly indicates that the reason for the warrantless search of Defendant's apartment was to conduct a protective, or "safety sweep," [Doc. 32-2, p. 4], the Government now argues that a different type of exigent circumstances, commonly called the "emergency aid" exception to the search warrant requirement, justifies the warrantless search of Defendant's apartment.   [Doc. 33, pp. 5-8]   In *Brigham City v. Stuart*, 547 U.S. 398 (2006), the Court expressly rejected the argument that only the subjective motivations of the officers at the time of their search should be considered.   *Id.* at 404.   Instead, the Court stated that "as long as the circumstances, viewed *objectively*, justify the action[,] . . . [t]he officer's subjective

7

motivation is irrelevant." *Id.* (Internal quotation marks, citations and brackets omitted). Accordingly, the Court will consider the Government's *post hoc* argument justifying the warrantless search under the emergency aid exception.

"[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978). One type of exigent circumstances is the emergency aid exception, also sometimes referred to as an exception based on "the risk of personal injury," which requires that "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011) (internal quotation marks and citations omitted). "The government bears the burden of proving that exigent circumstances rendered a warrantless search reasonable." *Id.*

In *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004), the Court held that exigent circumstances existed to justify entering a suspect's home. There,

> officers had just broken up a heated argument in which a firearm had been brandished, one of the participants in that argument had defied police orders and stashed the gun in a rear area of the apartment, and the officers had no way of knowing if there were others in the apartment with access to the gun.

*Id.* at 1177-78. Thus, the Court found the search to be justified because "officers . . . faced a situation in which there were firearms inside the home, it was unclear how many

people were inside the home, and the circumstances gave rise to a reasonable fear that the firearms might be used against the officers or others." *Id.* at 1177.  The Court reasoned that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id.* at 1178 (internal quotation marks and citations omitted).

More instructive to the case at hand are cases such as *United States v. Najar*, 451 F.3d 710 (10th Cir. 2006).  In *Najar*, in the early morning hours, an unidentified person called 911 and then hung up.  *Id.* at 715-16.  The dispatcher tried four times to call the residence from which the call originated, and each time the phone was picked up and then hung up without any verbal response.  *Id.* at 716.  Officers responded to the residence and saw lights on.  *Id.*  An officer knocked repeatedly, loudly announcing "police officer." *Id.*  Officers then heard movement inside and resumed knocking, eventually using the butt end of the flashlight to knock and increasing the volume of announcing themselves verbally.  *Id.*  Officers asked dispatch to try calling again, but this time no one answered. *Id.*  Finally, one officer saw the occupant through the window, got his attention, and told him to open the door.  *Id.*  Mr. Najar opened the door, and by this time thirty minutes had passed since the officers arrived.  *Id.* at 716, 719.  Officers asked if everything was ok, whether anyone else was present, and whether he had called 911.  *Id.* at 716.  Mr. Najar responded that everything was fine, no one else was present, and that he had not called 911. *Id.* at 716-17.  Officers requested permission to come in and look around, which Mr. Najar denied, but police entered anyway, explaining that they needed to "make sure there was no

9

one hurt in the house." *Id.* at 717 (internal quotation marks omitted). A woman was in the house. *Id.*

The *Najar* Court found that the emergency aid exception applied to allow the warrantless search. *Id.* at 719. The Court reasoned as follows:

> The officers arrived in response to a 911 call where the occupant repeatedly refused to answer the telephone or the door. As other courts have recognized, "911 calls are the predominant means of communicating emergency situations." *Holloway*, 290 F.3d at 1339 (*citing Richardson*, 208 F.3d at 630 ("A 911 call is one of the most common-and universally recognized-means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.")). "Such calls are distinctive in that they concern contemporaneous emergency events, not general criminal behavior." *Id.*
>
> In this case, by the time the officers arrived, they were aware dispatch had been unable to make contact with any occupant. Even more alarming, someone was answering the phone but immediately placing it back on the receiver. We are not persuaded by Najar's insistence that these facts show merely "that someone was home and did not want to talk on the phone at 2 a.m." (Appellant's Br. at 8.) A reasonable person could well be concerned that someone was trying to prevent communication with safety officials, not merely avoid it.
>
> Finally, Najar maintains he was "cooperative" when he finally answered the door and therefore the officers had no reason to believe someone in the trailer was injured. This argument ignores the fact that Najar denied calling 911 and then stated he was the only one in the home. The officers had independent corroboration (the earlier call from dispatch to the home while they were present) that the call did come from Najar's residence. Therefore, it was eminently reasonable for them to conclude that Najar was either lying about making the call or about being the only occupant. Given the totality of the circumstances, the officers had reasonable grounds to believe someone inside the trailer may have been in need of emergency aid and immediate action was required.

*Id.* at 719-20.

There are some similarities between this case and *Najar*.  In both *Najar* and this case police officers were responding to a 911 call and there was some delay between officers arriving and officers convincing the occupant to open the door.  However, the similarities end there.   Here, police officers had spoken to the 911 caller, and based on the 911 call officers had reason to believe that a woman was inside the apartment and in fear of the male who was also inside and threatening her with a knife.   After officers arrived at the apartment, though initially unable to get a response from the occupants, eventually officers managed to speak to both J.L. and Defendant through separate doors.   Finally, Defendant opened the door, came out, and was arrested.   Immediately thereafter, police officers saw and verified the safety of J.L. and her children.   Having arrested Defendant and determined the safety of J.L. and her children, any reasonable belief that anyone was inside needing emergency aid was dispelled prior to the warrantless search.   This case is clearly, therefore, different from *Najar*, in which the officers still had reason to believe there was a person in the house who had called 911 and the defendant was not yet in custody at the time of the warrantless search.  *Id*.

Emphasizing that officers were responding to a 911 call, the Government argues that "[o]fficers had no way to know who else may be inside the defendant's apartment or who else may need help."   [Doc. 33, pp. 7-8]   This argument fails for two reasons.   First, an "objectively" reasonable basis to believe someone needs aid requires some articulable basis to suspect that such a person exists.   It is always the case that officers do not know whether anyone is inside who may need help until they search a residence, but the Fourth

11

Amendment requires some evidence supporting a belief that those circumstances might be in play. *Martinez*, 643 F.3d at 1299-1300 ("The sanctity of the home is too important to be violated by the mere possibility that someone inside is in need of aid—such a possibility is ever-present. It is for this reason that exceptions to the Fourth Amendment's warrant requirement are subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks and citations omitted)). Here, given the facts known to the officers, there was no reason to believe that anyone else besides J.L. and her children were inside or in need of emergency aid. Second, while, as recognized in *Najar*, a 911 call often does signal an emergency, *Najar*, 451 F.3d at 719, and the 911 call here objectively did create a belief of an emergency of a woman being threatened with a knife, the objective belief of an emergency was dispelled in this case prior to the warrantless search. Following *Najar*, our Tenth Circuit clarified that the *Najar* Court "expressly did not hold that a response to a 911 call will always justify a warrantless entry upon the arrival of law enforcement." *Martinez*, 643 F.3d at 1297 (internal quotation marks and citation omitted). Instead, a 911 call must be considered in the totality of the circumstances. *See Najar*, 451 F.3d at 720. The totality of the circumstances in this case demonstrate that officers did not have reason to believe someone else in the home needed aid at the time they searched the apartment.

The Government further relies on "standard police practice" to uphold the warrantless search. The Government states "[h]ere, officers' protective sweep of the defendant's apartment was part of their standard police practice on domestic violence calls

12

based on protection of others." [Doc. 33, p. 7]   This policy clearly abdicates the Fourth Amendment analysis that officers must make by asking themselves whether the facts of the case are sufficient to warrant an objective belief that someone is in need of aid.   *See Missouri v. McNeely*, 133 S.Ct. 1552, 1559 n. 3 (2013) (reaffirming the general principle that, determining "whether an emergency existed that justified a warrantless search, naturally calls for a case-specific inquiry").   It is inappropriate "to apply the emergency assistance exigency*, per se*, in domestic violence situations."   *Najar*, 451 F.3d at 719.   If the Albuquerque Police Department has adopted such a policy, it runs the risk of violating citizens' Fourth Amendment rights to be free from unreasonable searches.

In sum, the totality of the circumstances known to the officers in this case at the time that they conducted the warrantless search of Defendant's apartment did not create an objectively reasonable belief that there was an immediate need to protect an unknown person's life or safety.   Thus, the search here was not justified by the emergency aid exception to the warrant requirement.   The warrantless search was illegal, and the fruits therefrom must be suppressed.   In this case, the fruit thereof includes the firearm and the statement of the firearm's existence included within the "Affidavit for Search Warrant."   As such, the Court must excise from the search warrant affidavit the statements regarding the firearm.

### *Without the Statements Regarding the Firearm, Probable Cause is Absent*

The Court next determines whether probable cause existed to support the search warrant absent the illegally obtained information about the firearm.   After excising

13

information pertaining to the firearm, the facts within the "Affidavit for Search Warrant" are:

1) J.L. called 911 and reported that her boyfriend "was inside the apartment [and] was threatening her with a knife and that he could not know she was calling the police or he would kill her";

2) one or more of the occupants barricaded the front door and refused to leave for 90 minutes;

3) Defendant came out and was detained;

4) J.L. stated that "she was in fear of receiving an immediate assault and/or battery from [Defendant]";

5) J.L. stated that Defendant had previously been violent against her and there was a pending domestic violence case against Defendant;

6) J.L. "stated that [Defendant] had arrived at the apartment 'high' and stated that [he] uses 'methamphetamine.'"

7) J.L. stated that she did not know whether there were any firearms or illegal narcotics inside the apartment.

8) Defendant admitted to being a convicted felon.

[Doc. 32-2, pp. 3-4]   In the "Affidavit for Search Warrant," the police did not request permission to search for a knife.   [Doc. 32-2, p. 3]   Instead, officers sought the warrant to search for firearms, ammunition and illegal narcotics, and evidence of who owned or used the apartment.   [Doc. 32-2, p. 3]   Accordingly, the Court must determine whether, upon

14

the facts set out, there was probable cause to search for evidence of firearms or narcotics. "[P]robable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. . . . [T]here must be additional evidence linking the person's home to the suspected criminal activity." *United States v. Harris*, 735 F.3d 1187, 1191 (10th Cir. 2013) (internal quotation marks and citation omitted).

> An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place. . . . The affidavit must show a nexus between ... suspected criminal activity and the place to be searched[.]

*United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009) (internal quotation marks and citations omitted).

Without the excised matter, i.e., the statements regarding the firearm, there is no probable cause to search for firearm. Nothing within the search warrant, as summarized above, suggested that Defendant was in possession of a firearm. As to illegal narcotics, the Court must consider whether J.L.'s statement that Defendant "had arrived at the apartment 'high' and that [he] uses 'methamphetamine'" is sufficient to support a search warrant. Evidence of drug use within a home, such as evidence of a "personal use" amount of drugs found in a trash pull, is sufficient to create probable cause to believe that evidence of drug use will be found in the home. *U.S. v. Colonna*, 360 F.3d 1169, 1175 (10th Cir. 2004), *overruled on other grounds by United States v. Little*, 829 F.3d 1177, 1182 (10th Cir. 2016). However, here there was no probable cause to believe that Defendant possessed drugs in the home. Instead, the evidence was simply that he returned to his

15

house under the influence of an illegal drug. Simply coming home under the influence of a drug is not sufficient evidence to create a nexus between the home and criminal activity. *See United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (concluding that probable cause was absent to search a home for drugs where the resident was arrested and searched outside on the front porch of his home and officers found a small bag of cocaine in his pocket). In *McPhearson*, the Court stated:

> The affidavit in this case did no more than state that McPhearson, who resided at 228 Shelby Street, was arrested for a non-drug offense with a quantity of crack cocaine on his person. These averments were insufficient to establish probable cause because they do not establish the requisite nexus between the place to be searched and the evidence to be sought.

*Id.* In this case, the purported victim of a domestic dispute stated that her ex-boyfriend returned to his house "high" on methamphetamine, while admitting that she did not know whether he had drugs in his home and stating that she had not been living at the apartment for the past month. This evidence alone is insufficient to create probable cause to believe that illegal narcotics would be found in Defendant's home.

Thus, because the search warrant affidavit did not establish probable cause absent the excised material, the search was not legal and the fruits thereof must be suppressed. *See United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014) (stating that evidence discovered in an illegal search must be suppressed unless it would have inevitably been "discovered by lawful means or without reference to the police error or misconduct" (internal quotation marks and citation omitted)); *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1164-65 (10th Cir. 1995) (stating that evidence must be suppressed when the

evidence was found "by exploitation of" an illegal search and not "by means sufficiently distinguishable to be purged of the primary taint" (internal quotation marks and citations omitted)).  Those fruits include the firearm and ammunition found and seized during the search of Defendant's apartment.  Defendant further argues that "any statements by Mr. Benavidez admitting ownership of that evidence" must be suppressed.  However, neither party identifies such statements[1] or the circumstances under which such statements were made, nor does either party make any argument regarding such statements, and thus, the Court cannot determine whether they would have been obtained absent the illegal search of Defendant's residence.

### *Good Faith Analysis*

The Government argues that, if the Court concludes that the warrant is not supported by probable cause, *Leon's* good-faith exception to the exclusionary rule applies. *See United States v. Leon*, 468 U.S. 897 (1984).  There is a circuit split, which the Supreme Court just recently declined to address, concerning whether *Leon's* good-faith exception applies to circumstances in which the police wrongfully obtained evidence which in part supports the statement of probable cause supplied in a later-obtained warrant. *Compare United States v. Ganias*, 824 F.3d 199, 221 (2nd Cir. 2016) *cert. denied* 2016 WL

---

1 The "Affidavit for Search Warrant" states: "Benavidez acknowledged to me that he is a previously convicted felon.  Benavidez denied at first any knowledge of a firearm being inside the residence that he had been residing in for approximately one month."  [Doc. 32-2, p. 4]   However, it is unclear from this statement whether Defendant ultimately stated he did know of the firearm and ammunition or possess the firearm and ammunition found during the search.

17

4540481 (December 5, 2016) (holding that the good-faith exception to the warrant requirement applied despite illegality prior to warrant) *and United States v. McClain*, 444 F.3d 556, 565-66 (6th Cir. 2005) (applying *Leon*'s good faith exception to allow the use at trial of evidence found during illegal protective sweep) *with McClain*, 444 F.3d 537, 543-548 (6th Cir. 2006) (dissent to denial of rehearing *en banc*) (stating that the panel erred in applying the *Leon* good faith exception and describing the circuit split). However, our Tenth Circuit refused to apply *Leon's* good-faith exception to the warrant requirement in a case in which agents had reasonable suspicion to suspect a suitcase had illegal drugs and seized the suitcase but then waited beyond a reasonable period of time before obtaining a warrant to search the suitcase. *United States v. Scales*, 903 F.2d 765, 767-68 (10th Cir. 1990). In rejecting the argument that the agents could nonetheless rely on the subsequently obtained warrant, the Court held that there was not good faith because "[t]he 'illegality' which arguably existed here was not a function of the agents' good faith reliance on a presumptively valid warrant." *Id.* at 768. The same reasoning applies in this case: because the illegal warrantless search was "not a function of the [officers'] good faith reliance on a presumptively valid warrant," *Leon's* good faith analysis should not be employed. *Id.* Instead, the evidence obtained as a result of the warrant must be suppressed.[2]

---

2 Given the Court's holding, the Court does not consider Defendant's remaining arguments, including that the police officers withheld material information in seeking the warrant [Doc. 32, p. 13] or that the Metropolitan Court Judge lacked the authority to issue the warrant in this case. [Doc. 32, p. 7]

18

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the COURT HEREBY GRANTS *Defendant's Motion to Suppress Evidence Derived from Illegal Search.* Evidence of the firearms and ammunition seized as a result of the unlawful search in this case is HEREBY SUPPRESSED.

**SO ORDERED** this 19th day of December, 2016 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge